AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
| v. | ) |
|  | ) Case No. 23-MJ-6248-PAB |
| Andrae Henderson | ) |
|  | ) |
|  | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __3/01/2023-6/06/2023__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Distribution of a controlled substance |
| Title 18, United States Code, Section 924(c) | Possession of a firearm in furtherance of a drug trafficking crime |
| Title 18, United States Code, Section 922(g)(1) | Possession of a firearm and/or ammunition while being a convicted felon |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jason Davis, Special Agent, ATF
*Printed name and title*

Sworn to and signed before me:

Date: 6-7-2023

_____
*Judge's signature*

City and state: Fort Lauderdale, Florida     Panayotta Augustin-Birch, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jason Davis, being duly sworn, state and depose that:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since November 2019. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I have my bachelor's degree in political science from Lander University. I am currently assigned as a Special Agent for ATF Miami Field Division, Fort Lauderdale Field Office. As an ATF agent, I have authority to investigate Title 18 and Title 21 offenses. I received specific training in the areas of firearms, narcotics, explosives, and arson investigations. I have investigated cases involving federal firearm and narcotic violations, unlawful possession of firearms, the possession of firearms by armed drug traffickers, illegal exportation of firearms, dealing in firearms without a license, homicides, and the distribution of illegal narcotics. Before my employment with the ATF, I was a Special Agent for approximately three (3) years with the United States Secret Service. While in the Secret Service, I investigated financial crimes, and more specifically, threats against the President(s) of the United States in a Protective Intelligence Squad. Prior to my Federal Law Enforcement career, I was an active duty Commissioned Infantry/Psychological Operations Officer with the United States Army, where I continue to serve in a reserve capacity with the United States Joint Special Operations Command (JSOC).

2. I submit this affidavit based on information known to me personally from the investigation, as well as information from other law enforcement officers who have investigated this matter, or other individuals who have personal knowledge of the facts herein. As such this affidavit does not contain all the information known regarding this investigation, but only those facts necessary to establish probable cause to issue a criminal complaint for **Andrae Henderson** ("HENDERSON")

for distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1); and carrying a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

## PROBABLE CAUSE

3. On or about March 2023, Hollywood Police Department (HPD) Vice, Intelligence, and Narcotics (V.I.N.) Detective Steve Kastner was contacted by an HPD Confidential Informant (hereafter referred to as a "CI") regarding an individual named "Dre" selling "crack" cocaine and fentanyl out of his apartment at 2221 Roosevelt Street, Hollywood, Florida (herein referred to as HENDERSON's residence). "Dre" was described as a short haired black male in his forties with gold teeth. The CI also stated that "Dre" had tattoos on his neck and identified multiple vehicles that "Dre" would drive and also identified his phone number as 772-626-5943. The phone number was queried to reveal that Andrae HENDERSON was associated with the number. Through investigative means, "Dre" was positively identified as HENDERSON.

4. On or about April 11, 2023, at approx. 5:30 P.M., the CI placed a controlled call to HENDERSON (772-626-5943) and ordered a half ounce (14 grams) of "crack" cocaine. HENDERSON told the CI the "crack" would be three-hundred and seventy-five dollars ($375.00), to which the CI agreed. Prior to executing the purchase of evidence operation, law enforcement searched the CI and his/her vehicle to ensure there was no contraband and/or currency present. The CI was given three-hundred and eighty dollars ($380.00) in HPD Investigative Funds. Prior to the CI movement to HENDERSON's residence, law enforcement set up surveillance on the residence and the CI was equipped with covert audio/video recording devices. Upon the arrival of the CI, HENDERSON exited his residence and walked toward the CI's driver door. HENDERSON was positively identified by law enforcement at this time. The CI handed HENDERSON three-hundred

and eighty dollars ($380.00) of Investigative Funds and HENDERSON handed the CI a clear plastic bag containing suspected "crack" cocaine and a clear plastic bag containing a free sample of suspected fentanyl. The CI and HENDERSON held a brief conversation. After the transaction, HENDERSON walked directly back into the front door of his residence and closed the door. The CI left HENDERSON's residence and returned to the pre-determined meet location followed by law enforcement. Upon arrival, the CI handed law enforcement the "crack" cocaine and fentanyl. Det. Kastner conducted a field test of each substance, which yielded positive results for the presumptive presence of cocaine weighing 15.7 grams with packaging and positive results for the presumptive presence of fentanyl weighing 2 grams with packaging.

5. On or about April 18, 2023, at approx. 4:50 P.M., law enforcement met with the CI to attempt a controlled purchase of narcotics at HENDERSON's residence. At approx. 4:47 P.M., the CI placed a controlled call to HENDERSON (772-626-5943). HENDERSON asked if the CI wanted the whole "zip.". A "zip" is a common street term used to refer to an ounce (28 grams) of any type of narcotic, with cocaine being the intended narcotic. Prior to this purchase of evidence operation, the CI spoke to HENDERSON to discuss the price of an ounce of cocaine, to which HENDERSON advised that it would be seven-hundred and fifty dollars ($750.00). HENDERSON maintained the aforementioned price during recorded control calls. Prior to executing the purchase of evidence operation, Det. Kastner and Det. Karl searched the CI and his/her vehicle to ensure there was no contraband and/or currency present. Prior to the CI movement to HENDERSON's residence, law enforcement set up surveillance on HENDERSON's residence. Det. Kerns positioned himself in the immediate area with a clear, unobstructed view of the front door of HENDERSON's residence. The CI was given seven-hundred and sixty dollars ($760.00) in Investigative Funds. The CI was equipped with covert audio/video recording devices. The CI proceeded to HENDERSON's residence and did not make any stops or make contact any other person prior to their arrival. Upon the arrival of the CI,

HENDERSON exited his residence and walked toward the CI's driver door. The CI handed HENDERSON seven-hundred and sixty dollars ($760.00) of Investigative Funds and HENDERSON handed the CI a clear plastic bag containing approx. one (1) ounce of suspected "crack" cocaine. The CI and HENDERSON held a brief conversation in the parking lot. After the transaction, HENDERSON walked directly back into the front door of his residence and closed the door. The CI left HENDERSON's residence and returned to the pre-determined meet location followed by Det. Kastner and Det Karl. Upon arrival, the CI handed Det. Kastner the "crack" cocaine. Det. Kastner conducted a field test, which yielded positive results for the presumptive presence of cocaine weighing 29.7 grams with packaging.

6. On or about April 26, 2023, at approximately 11:30 A.M., law enforcement met with the CI to attempt a controlled purchase of two (2) ounces of "crack" cocaine at HENDERSON's residence. At approximately 11:40 A.M., the CI conducted a recorded controlled phone call to HENDERSON (772-626-5943). During the controlled call, HENDERSON asked the CI what he/she were looking for. The CI asked HENDERSON for "two of them," referring to two (2) ounces of "crack" cocaine. HENDERSON then asked the CI if they wanted the cocaine cooked prior to their arrival, to which the CI asked that he cook it up before they arrive. During the recorded call, HENDERSON maintained that the price would remain the same. Prior to executing the purchase of evidence operation, Det. Kastner and Det. Karl searched the CI and his/her vehicle to ensure there was no contraband and/or currency present. Detectives and Agents setup surveillance around the residence. Det. Kerns positioned himself in the immediate area with a clear, unobstructed view of the front door of the target residence. The CI was given fifteen-hundred dollars ($1500.00) in DEA Official Authorized Funds (OAF). The CI was equipped with covert audio/video devices. The CI proceeded to HENDERSON's residence and did not make any stops or make contact any other person prior to their arrival. Upon the arrival of the CI, HENDERSON exited the front door of his residence

and advised the CI to come inside. The CI then exited their vehicle and walked inside with HENDERSON. HENDERSON then began actively cooking the "crack" cocaine in the kitchen area of the residence using kitchen pots and utensils. The CI then placed the fifteen-hundred dollars ($1500.00) of DEA OAF funds on the kitchen counter. The CI and HENDERSON held an extensive conversation as HENDERSON continued manufacturing the "crack" cocaine. After the "crack" cocaine was successfully cooked, HENDERSON packaged it inside of a clear plastic bag. HENDERSON then handed the CI the clear plastic bag containing several large pieces of "crack" cocaine. HENDERSON advised the CI that he cooked an additional 14 grams (approximately) and placed it in the same bag as the two (2) ounces. After the transaction, the CI exited HENDERSON's residence and returned to their vehicle. The CI did not make any stops, nor encounter any other person upon exiting the residence and entering the vehicle. HENDERSON remained inside of the target location. The CI left HENDERSON's residence and returned to the pre-determined meet location followed by Det. Kastner and Det Karl. Upon arrival, the CI handed Det. Kastner the "crack" cocaine. Det. Kastner conducted a field test, which yielded positive results for the presumptive presence of cocaine weighing 75.2 grams with packaging.

7. On or about May 15, 2023, at approximately 7:02 P.M., Detectives Kastner and Kerns met with the CI to conduct a recorded controlled phone call to HENDERSON (772-626-5943). During the phone call, the CI asked HENDERSON for 3 or 4 ounces of "hardware," which is another common street term used to refer to "crack" cocaine. HENDERSON agreed and stated the "crack" cocaine would be available. The CI then asked HENDERSON if he was able to purchase one (1) ounce of fentanyl, at which point HENDERSON stated that he had to ask his source of supply and wait for the source to contact him back. On a prior occasion, HENDERSON advised the CI that one (1) ounce of fentanyl would be $1500. The CI and HENDERSON agreed to meet for the purchase on the following day, May 16, 2023.

8. On or about May 16, 2023, at approximately 4:30 P.M., law enforcement met with the CI to attempt a controlled purchase of two (2) ounces of "crack" cocaine and one (1) ounce of fentanyl at HENDERSON's residence. At approximately 4:51 P.M., the CI conducted a recorded controlled phone call to HENDERSON (772-626-5943). HENDERSON did not answer the phone call; however, HENDERSON immediately called the CI back. The CI advised HENDERSON that he/she was on the way to the residence. Detectives and Agents then setup around the target location to begin conducting surveillance. Detective Kerns positioned himself in the immediate area with a clear, unobstructed view of the front door of the target residence. While on surveillance, Detective Kerns observed HENDERSON actively entering and exiting the front door to his residence. Prior to executing the purchase of evidence operation, Det. Kastner and Det. Brasso searched the CI and their vehicle to ensure there was no contraband and/or currency present. The CI was given three-thousand dollars ($3000.00) in DEA Official Authorized Funds (OAF). The CI was equipped with covert audio/video devices. The CI proceeded to HENDERSON's residence and did not make any stops or make contact any other person prior to their arrival. Upon the arrival of the CI at the residence, HENDERSON exited the front door of his residence and advised the CI to come inside of the residence. The CI then exited their vehicle and walked inside the residence with HENDERSON. HENDERSON retrieved a clear plastic bag containing a purple, powder substance from a camouflage backpack. The CI then handed HENDERSON fifteen-hundred dollars ($1500.00) of DEA OAF funds. HENDERSON then stated "that's the F." "F" is a common street term used to refer to fentanyl. HENDERSON then confirmed that the CI wanted to purchase two (2) ounces of "crack" cocaine, at which point the CI handed HENDERSON the additional fifteen-hundred dollars ($1500.00) of DEA OAF Funds. HENDERSON then began actively cooking the "crack" cocaine in the kitchen area of the residence using kitchen pots and utensils. The CI and HENDERSON held an extensive conversation as HENDERSON continued manufacturing the "crack" cocaine. During this

conversation, HENDERSON advised the CI that he had a firearm in the bedroom and that he would sell it to the CI for what he paid for it, which was eleven-hundred dollars ($1100.00). The CI was not equipped with any additional currency to purchase this unknown make/model firearm at the time. After the "crack" cocaine was successfully cooked, HENDERSON packaged it inside of a clear plastic bag. HENDERSON then handed the CI the clear plastic bag containing a large piece of "crack" cocaine. HENDERSON advised the CI that the weight was approximately four (4) grams short of two (2) ounces due to it being freshly cooked. After the transaction, the CI exited the residence and returned to their vehicle. HENDERSON remained inside of the target location. The CI left HENDERSON's residence and returned to the pre-determined meet location followed by Det. Kastner and Det Karl. Upon arrival, the CI handed Det. Kastner the "crack" cocaine. Det. Kastner conducted a field test, which yielded positive results for the presumptive presence of cocaine weighing 52.1 grams with packaging. The field test yielded positive results for the presumption presence of fentanyl weighing 30.2 grams with packaging.

9. On or about May 22, 2023, at approximately 9:38 P.M., Detective Kastner and Kerns met with the CI to conduct a recorded controlled phone call to HENDERSON (772-626-5943). During the phone call, the CI asked HENDERSON if he/she was able to purchase two (2) ounces of Fentanyl (referred to as "Barney") and two to three ounces of "crack" cocaine. "Barney," is another street term used to refer to purple Fentanyl. HENDERSON agreed and he re-advised the CI that the ounce of Fentanyl costs fifteen-hundred dollars ($1500.00). The CI and Henderson agreed to meet for the purchase on or about May 25, 2023.

10. On or about May 24, 2023, at approximately 7:09 P.M., Detectives Kastner and Kerns met with the CI to conduct a recorded controlled phone call to HENDERSON (772-626-5943). During the phone call, the CI asked HENDERSON if the two (2) ounces of fentanyl would be available for

the following morning, to which HENDERSON stated that he only had one (1) ounce on him at the time. The CI and HENDERSON agreed to meet for the purchase on Thursday, May 25, 2023.

11. On or about May 25, 2023, at approximately 10:15 A.M., law enforcement met with the CI to attempt a controlled purchase of one (1) ounce of suspected fentanyl for fifteen-hundred dollars ($1500.00) and two (2) ounces of "crack" cocaine for fifteen-hundred dollars ($1500.00) from HENDERSON. The CI was also attempting to purchase an unknown make/model firearm from HENDERSON, which was previously discussed on audio/video during the buy on May 16, 2023. During that purchase, HENDERSON advised that he currently had a firearm in the bedroom, and he would sell it for eleven-hundred dollars ($1100.00). At approximately 10:32 a.m., the CI conducted a recorded controlled phone call to HENDERSON (772-626-5943). HENDERSON advised the CI that there was still currently one (1) ounce of fentanyl. The CI then asked HENDERSON to cook two (2) ounces of "crack" cocaine and that he/she was on their way to the residence to pick it up, to which HENDERSON agreed. There was no mention of the firearm during the controlled call. Detectives and Agents then setup around the residence to begin conducting surveillance. Det. Kerns positioned himself in the immediate area with a clear, unobstructed view of the front door of the target residence. While on surveillance, Det. Kerns observed HENDERSON arrive at the residence in a black Mercedes sedan (FL Tag #QQE-D96), which is registered to HENDERSON. HENDERSON then exited his vehicle and entered his residence. Prior to executing the purchase of evidence operation, Det. Kastner and DEA SA Cerda searched the CI and their vehicle to ensure there was no contraband and/or currency present. The CI was given three-thousand dollars ($3,000.00) in DEA OAF for the narcotics and an additional eleven-hundred dollars ($1100.00) in Investigative Funds to attempt to purchase the unknown firearm that HENDERSON previously mentioned. The CI was equipped with covert audio/video recording devices. The CI responded directly to the target residence, followed by Det. Kastner and DEA SA Cerda. The CI did not make any stops or encounter any other person prior

to their arrival at HENDERSON's residence. Upon the arrival of the CI at the target location, HENDERSON exited the front door of his residence and advised the CI to come inside. The CI then exited their vehicle and walked inside the residence with HENDERSON. Upon entering the target location, the CI inquired about purchasing a firearm. HENDERSON stated that he currently had a "stick" on him and that he would sell it to the CI for what he paid for it, which was eleven-hundred dollars ($1100.00). "Stick" is a common street term used to refer to a rifle. HENDERSON and the CI then continued conversing in the kitchen area as HENDERSON continued actively cooking "crack" cocaine on the stove. HENDERSON eventually retrieved a gray plastic bag containing suspected purple fentanyl, which was in the form of a chalky powder substance. The CI and HENDERSON held an extensive conversation as HENDERSON continued manufacturing the "crack" cocaine. During the conversation, HENDERSON walked toward the couch area and retrieved a black Bushmaster rifle (serial # ARB24931) with an optic attached. HENDERSON broke down the weapon system and extracted a "switch" from it. A "switch" is a device that is implemented in a semi-automatic weapon, allowing it to become an automatic weapon. While detaching the "switch" from the weapon, HENDERSON articulated its function to the CI and advised that he paid six-hundred dollars ($600.00) for it and that he would keep it for himself. HENDERSON then went back to the kitchen area to finish manufacturing the "crack" cocaine. During this time, the CI left all forty-one hundred dollars ($4100.00) of Investigative Funds on the counter for HENDERSON, at which point he counted it. Once the "crack" cocaine was successfully cooked, HENDERSON packaged it inside of a clear plastic bag and cut it in half. HENDERSON then put the plastic bag containing the "crack" cocaine inside of the same gray plastic bag that contained the suspected fentanyl. After the exchange of narcotics, HENDERSON walked into an unknown area of the interior of the residence and came back with two (2) 30-round magazines for the CI. HENDERSON provided the CI with forty-eight (48) rounds of ammunition, .233 caliber rounds. HENDERSON wrapped the magazines in a brown

plastic bag and handed them to the CI. After the transaction, the CI exited the residence and returned to their vehicle and opened the trunk for HENDERSON so he could place the firearm in the trunk. The CI then entered their vehicle and HENDERSON exited the residence with the rifle and placed it into the trunk of the CI vehicle. HENDERSON then re-entered the residence. The CI immediately called HENDERSON to make sure anything wasn't left in the residence. HENDERSON responded, "Nah, that's everything. I put both of them in the same bag…" The CI left HENDERSON's residence and returned to the pre-determined meet location followed by Det. Kastner and DEA SA Cerda. Upon arrival, the CI handed Det. Kastner the "crack" cocaine, suspected fentanyl, and the two (2) rifle magazines containing the ammunition. Det. Kastner then retrieved the rifle from the trunk of the vehicle and rendered the firearm safe. A field test on the narcotics was conducted by Det. Kastner, which yielded positive results for the presumptive presence of cocaine (60.9 grams with packaging) and positive results for the presumptive presence of fentanyl (26.9 grams with packaging). HPD Crime Scene Technician J. Browne responded to the meet location for photographs and DNA swabs of the firearm.

12. On or about May 31, 2023, ATF Interstate Nexus Expert SA Jared Kattah determined the Bushmaster model XM15-E2S, 223-5.56 mm caliber semiautomatic rifle bearing serial number ARB24931 purchased from HENDERSON on May 25, 2023, and the accompanying ammunition, were all manufactured outside of the state of Florida. By their subsequent presence in Florida, they must have traveled in and/or affected interstate and/or foreign commerce.

13. A criminal history check revealed that prior to June 6, 2023, HENDERSON has been convicted of one or more crimes punishable by imprisonment exceeding one year (felony offense) and has been sentenced to over one year in prison on more than one occasion. Based on the length of time that HENDERSON has spent in custody for one or more of the HENDERSON's felony convictions, he knew he was a felon at the time of his possession of the firearm and ammunition

mentioned in paragraph 8, 10, 12, and 13. A search of NCIC revealed that HENDERSON has felony convictions in Broward County, 17th Judicial Circuit of Florida to include several convictions for the Distribution of Cocaine.

14. A clemency check with the State of Florida reflects that HENDERSON has not has his right to possess a firearm restored. The firearms and ammunition recovered from the vehicle were not manufactured in the State of Florida, and thus travelled in interstate commerce.

15. Based on the forgoing, your affiant believes that probable cause exists to arrest Andrae HENDERSON for distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1), and carrying a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

FURTHER AFFIANT SAYETH NAUGHT.

JASON DAVIS
ATF SPECIAL AGENT

Sworn and subscribed before me
this  7th  day of June, 2023.

PANAYOTTA AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _23-MJ-6248-PAB_____

### BOND RECOMMENDATION

DEFENDANT: Andrae Henderson

Pre-Trial Detention is Recommended

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: *M. Catherine Koontz*
AUSA: M. Catherine Koontz

Last Known Address: _____

What Facility: _____

Agent(s): ATF Jason Davis
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)